Lane Construction Corporation v. Skanska USA, 24-12638. All right, we've got Mr. Frederick here for Lane and Mr. Stein and Mr. Henner here for Skanska and Granite, respectively. Mr. Frederick, you've reserved three minutes. Yes. Thanks very much, Judge Newsom. You're welcome. May it please the Court. David Frederick for the appellants. The District Court applied the wrong standard for evaluating Skanska SE's breach of fiduciary duty and overlooked disputed factual issues in rendering summary judgment on the contract issues. On fiduciary duty, Florida law applies a no-conflict standard, prohibiting conflicted partners from, quote, conducting partnership business, close quote. That's at 620.84042B, set forth in the addendum at page 2. The District Court erred . . . Can I ask you one quick question? You've characterized that language as a no-conflict rule. Is that necessarily true? Is that necessarily what an adverse interest is? What the statute also goes on to say is that there are ways of getting around adverse interests. But here, based on the facts, it was clear that if Skanska SE lost money, Skanska ID would make money. That is the classic adverse interest in any kind of conflict situation. And yet, Lane and Granite uniquely were not able to make up any money, notwithstanding the $500 million of losses. Can you explain? I just don't follow that, that if SE lost money, the other makes money. So this building contract, the construction piece of it, SGL, was losing up to $500 million. On the concession side, I4MP was a partnership that was going to make money on tolls. Skanska ID was the 50% owner of the concessionaire. I guess I get the idea that the concessionaire is going to make money if the report is completed. But it doesn't require the others to lose money for it to make money. Well, yes, it does, because they were the financiers of the construction part of the project. So if they have to pay less for the construction of the project, that means that as the tolls flow in, they will make more. And that's why Skanska ID was disincentivized to use its leverage with the Florida Department of Transportation to try to alter the deal or to try to help make the construction partners of SGL made whole. That conflict of interest was only potential at the time of the agreement, but it became actualized four years later when Skanska's U.S. head, Mr. Kennedy, came and put the kibosh on any effort by SGL to force or try to force I-4MP into a negotiated resolution that would help stem these losses. And because Florida has this very plain language, we just ask you to apply the statute by its terms, that the partner cannot act on behalf of a partner having an interest adverse to the partnership. The district court got this right at summary judgment and applied that language and that statute. But then after the trial occurred, flipped and applied a quote, best interest standard. You can see by the language that we have set out, appears nowhere. It's completely extra textual. And what the district court did was it flipped and it disregarded the idea of no conflicts by trying to look more holistically at whether or not this was somehow in SGL's interests, which it clearly was not. And so if you apply the plain language of the statute, you have to conclude, we submit that Skanska S.E. breached its fiduciary duty as the managing partner of SGL to Lane. Can I ask you a question? I feel like we've gotten sort of close to this, but maybe we haven't quite discussed it yet. Is it your position that simply this corporate sibling relationship itself violates the no conflict rule, or that in this case, the corporate parent, the AB, sort of pressured, the sort of exerted pressure that itself violated the no conflict? There is not an, there is a potential conflict in the nature of the structure. And I want to be very clear about that, Judge Newsom. But this SGL operated for four years without any actualization of the conflict of interest. The actualization of it occurred in 2018 when it became clear that the only way to help stem the losses was for SGL to attempt to exert pressure on the financing arm, which was I-4MP, and threw I-4MP to FDOT. I guess my concern is that, so it sounds like, I think wisely, you've sort of sworn off the position that like in the nature of the corporate structure, there's just a conflict. Because that would require you to ignore corporate formalities or whatever. And so you say, no, no, no. It's just in this case, it was actualized. But I mean, hasn't the district court made findings, specifically with respect to the relationship between AB and Holland and Knight, that there really wasn't this pressure brought to bear? Well, what the district court did was make findings under the wrong standard. Had the district court made findings under the correct standard we submit, it would have had to conclude that the interest was adverse within the meaning of the statute. And I think the district court recognized that, because after having articulated the correct standard at the summary judgment, and this is at page JA-999, the court then in the post-trial order said five times the proper standard is whether Skanska acted in the best interests of SGL. And I think that it doesn't take an economic rationalist very long to conclude that when the construction partnership is going to lose a half a billion dollars and no way for two of the partners ever to make up any of those losses, there's an adverse interest. Mr. Frederick, is it your argument, going right back to the beginning, that Southeast should not have entered into this arrangement? No, there are many... No, because everybody knew, as I understand it, that ID was in the concessionaire. No, our position is that in many public-private partnerships, a similar structure occurs, but that doesn't mean that there is an actualized conflict. Well, looking forward, the possibility of what the conflict you're talking about was there at the beginning, was it not? The potential for it was. That's what I'm talking about. Yes, but... Just a minute. The statute says interest adverse. Are you conceding that SE can enter into this joint venture agreement when it happened, and then, of course, with the contract with the concessionaire? That was all right? Yes. Is that your position? My position, Judge Toflat, is that in 2014, there was only the potential for conflict. I understand. That's all. The violation of the statute didn't occur until 2018. What your argument now is, is that it grew, the potential became a reality.  Okay. And the violation of the statute for the breach of fiduciary duty occurred in 2018 when the Skanska head of the United States, overseeing both ID and SE, stopped SGL from threatening termination because that uniquely harmed ID's interests financially. Now, if you look at what consequences flowed from that, it meant that there was not going to be a way, practicably, for SGL to recoup the huge losses that were occurring, and only SE and ID were going to be able to balance the interests that would be for the benefit of Skanska AB. That's a classic conflict of interest. That's a classic breach of fiduciary duty. And what we proved at trial was that you could consider the way that this hypothetically should have borne out by looking at the massive capital calls that were being imposed by Skanska SE. I mean, what do you say about the district courts? And I think this was a finding, more or less. The district courts said, look, this threatened to terminate thing. This strategy would have never worked. It was a bad idea. Not a good idea. And that was disregarding the plain language of the statute, which says that it shall be having any effect on doing partnership business. What the district court should have held in applying equitable remedies is that once that violation occurred, Skanska SE should have either erected a firewall and not had dealings between it and ID. It should have absented itself from those conversations. And there are a range of equitable remedies that even go to disgorgement that would have been applicable once the violation of the fiduciary duty occurred. So Judge Brasher, to answer your question even more directly, if the district court applied the wrong standard for understanding how to sequence the breach of fiduciary duty with the consequences that flow from that, it couldn't make the best interest finding. When and point of time did this potential become a reality? When exactly?  In the fall? So during the... 2018 when they were making the decision. Is that your... That's correct. Because what had happened... In other words, at the time they were discussing the decision, they had this outside information and everything else. Southeast should have withdrawn? Is that what Southeast should do? There are a range of different... What should Southeast do at that point in time? What happened, and if I can go through the chronology... Could you just tell me what Southeast should have done? There are several things Southeast should have done. Number one, erected a firewall so that there would be no tainting between the other Skanska entities and SE's decision. Number two... How would they erect a firewall? Because what happened was the... Initially all three members of SGL thought that the termination option should be advanced. Granted, in fact, had proposed that to begin with, and it was only when the Skanska supervisor for the United States got involved that SE changed its position. That's what the evidence showed. And that was through the course of mid to late 2018. What would the firewall law look like? One aspect of it would have been that SE would be not engaged in any dealings between SGL's remaining... SE withdraws from the discussion altogether? For that particular... At the very moment, and I take it that Lane is telling SE to do that at that time? That's correct. Yeah. That you should withdraw. You should not... As opposed to, I don't agree with you. Correct. That you should not be participating in this decision with your Skanska counterparty, I4MP, over the termination option as a way of increasing leverage. What do you say? I mean, so Judge Dalton, I think, found as a factual matter that Kennedy, who I think is the person you're saying made this determination, did not have an improper motive, was not pressured, and he made the determination. He did that by not looking at what the adverse interests were between Skanska SE and... I guess here's the... So they're already separate corporate structures, and your response is sort of the way to solve this problem is to have a firewall, but they're already separate corporate structures, and then we have a finding that the person running, I guess it was SE, was not pressured to making this determination based on what the sister company's profit or loss would be. What is it that a district court is supposed to fix here? I think the district court should have applied what it said on JA-999, and then said SE has breached its fiduciary duty, therefore we need to look at what remedies flow from that. One of them could be to disassociate SE from the dealings of SGL with I-4MP. Another could be to provide for disgorgement of the improper profits I-4MP would get by the tolls that were going to occur later in the future. Judge Brasher, there are a range of different fiduciary duties. We never got to the idea of what equitable remedies should flow, whether they be injunctive, declaratory, disgorgement, et cetera. How could you have equitable remedies when Lane is going along with the arrangement? Lane was objecting to the . . . I know they objected, but how could they have . . . In the end, Lane went along. No. Lane objected and reserved its rights every single time between 2018 to now. There should be a hearing about that, Judge Schoflat. That's our point, that when there is a breach of fiduciary duty, the proper thing is to have an equitable proceeding where you consider the full range of potential remedies. We never got to have that, and that's our position that you cannot have a violation of a statute as plain as this one is without having an appropriate consideration to looking at what the proper alternatives for this arrangement, and it could have been changing the equity interest. It could have been disassociating SE. I'm offering hypotheses . . . In other words, a court would rearrange the partnership agreement? Well, what the corporate law was here . . . No, no, no. A court would rearrange the partnership arrangement. That's correct, and that happens often in equitable actions where the court of equity . . . Granted, an SE said, here's where we're headed. Lane could have gone to court at that point and sought an equitable remedy. We did. We sued for a breach of . . . No, no, immediately. Judge Schoflat, the . . . I know you sued ultimately. I think we sued as soon as appropriate in light of the circumstances when the full actualization of the conflict manifested itself in SE's improper behavior. Can I . . . Ms. Geddes, can we give Mr. Frederick two additional minutes because I'd like to hear about your breach of contract argument before you sit down. On the contract issues, the district court disregarded disputed material facts. If the capital call was invalid because it was not done under the proper Article 7.1 procedures for unanimity, then Lane's refusal to pay could not have been a breach of the joint venture agreement. Our argument is that the court improperly rendered summary judgment because the question it ultimately decided was simply Lane didn't pay, therefore it breached. That's not the way to understand how Article 7 works. Having made that error, the court didn't look at whether or not there was a proper capital call and a proper rejection of a capital call that had been improperly rendered. Because of that, there should have been a trial on the disputed issues of fact. The court's reasoning, which I want you to directly address, when the court's reasoning was law, either you have a unanimous call, which is sort of what you're disputing, or you have a unilateral call, but under no circumstances does Lane not get to pay, right? The court says, look, either way, you got to pay, so no need to have a trial. We're arguing for a textualist position both on the statute on financiary duty and on the contract with respect to the contract terms. The contract is so clear that no one here defends the district court's reasoning that the unilateral provision under Article 4.3 applies. The reason why, if you read all the way through, you get to the last sentence, and you see it doesn't apply if there is a particular set of circumstances. The other side here does not defend the district court's unilateral argument that it subscribed to, and it's sort of made up out of thin air to go to Article 4.3. For that reason, summary judgment is completely improper. You've got disputed issues of fact as to unanimity and timing, and you also have an application where the district court applied a contract provision that the parties themselves don't believe applied. So then if you accept the idea that there was a wrongful summary judgment, then you have to vacate the monetary award that was given because that then affects and has infected the breach of fiduciary duty claims as well as the contract claims. And so you need to have a new proceeding in this matter. Very well. Thank you, Mr. Frederick. You've got three minutes remaining. Mr. Stein, are you first up? Very well. Just so we understand, how do you and Mr. Henner propose to split your time? Are the issues different? Yes, they are. I'm going to take up ten minutes. Mr. Henner is going to take up five minutes. And you're addressing what? Just so I'm clear. I'm addressing the breach of fiduciary duty issues. May it please the court, Gary Stein on behalf of Appellee Skanska USA Civil Southeast. After a full trial, the district court considered the testimony of 23 witnesses and 629 exhibits and issued a 40-page opinion wholly rejecting Wayne Constructions' claims. The court found by overwhelming evidence that Skanska SE acted in the best interest of the joint venture in negotiating and executing. I think, though, Mr. Frederick, I saw him kind of perk up. I mean, I think his response is going to be, yeah, yeah, yeah, best interest. That's not the standard. I agree. It's not the best interest. The overwhelming evidence is that Skanska didn't breach its fiduciary duties or responsibilities to SGL in any respect. I guess when the district court sort of got around to talking best interest talk, do you acknowledge that that is sort of like not fundamentally the standard under the statute? I think it is fundamentally the standard under the statute. Let me address the statute itself in this moment. If we're talking about 620-8404-2B, if you look at B, it talks about how the partner is to refrain from dealing with the partnership and the conduct or winding up of the partnership business as or on behalf of the party having an interest adverse to the partnership. The clear words talk about to refrain from dealing. This requires a transaction by the partner. On the other side of the table, from the partnership, and acting in a way that's adverse to the interest of the partnership, and that's exactly what the district court said did not happen here. It did not happen because Skanska SE acted in the best interests of SGL, so how could it have dealt with the partnership on the other side of the table if it was never on the other side of the table? In the negotiations with FDOT that resulted in SA-22, that was supplemental agreement 22, the court found that it was in the best interests of SGL to actually negotiate and execute that agreement. The court found by overwhelming evidence, contrary to the comments of Mr. Frederick, that there was any improper communication between and among Skanska ID, Skanska SE, and Skanska AB. The court specifically found, Mr. Frederick referred to the evidence relating to Mr. Kennedy, but if you look at the district court's opinion, what he said was it was clear that Mr. Kennedy was only there as a placeholder as they transitioned from Mr. Cavallaro, who was the CEO of SE, to Don Fusco as the CEO of SE. The court found by, again, overwhelming evidence that Mr. Fusco was solely acting in the interests of Skanska SE and SGL and was not in any way influenced by what availability payments may have been received or was to be received by I4MP. That was not within his consideration. As Mr. Fusco testified and as the court pointed out, Mr. Fusco reasonably relied on the legal opinions of two outside law firms for SGL, who said to pursue the termination option would have been crazy. In fact, the lawyer from Holland and Knight, Ben Subin, issued a legal opinion that went so far as to say to pursue the termination option would have been reckless. Based upon that legal advice and his own business considerations, because of what could have happened had they pursued the termination option, he chose to go in pursuit of SA-22. In fact, the district court, in his ruling, specifically said he described the decision to reject termination, in his words, as a no-brainer, not a breach, and he found that pursuing or even threatening termination, and again, in the judge's own words, likely, he used the word likely, would have been ruinous for all involved. It's also important for this court to remember that when WeBuild purchased Lane, WeBuild and Lane, this is in the record, developed a plan to sue Skanska SE. And this was, this plan began in February of 2018. There are several documents in the record, internal communications between WeBuild and Lane, where Lane is formulating, before Lane is formulating this conflict of interest theory, when February, March, April of 2018, Lane is being directed to hire the best outside counsel in the United States. They're being directed to come up with legal theories to sue Skanska. This is months before they begin throwing out the conflict of interest issue as a basis to pursue the termination option to have Skanska. At that point in time, as I asked your colleague, is what Lane should have done? In my recollection, Wayne didn't do anything in terms of seeking an equitable remedy at that point. And let me, let me clarify the record in that respect. Lane starts in the summer of 2018 saying, we're concerned about a conflict of interest, we're concerned about it. The JV is looking very seriously at whether or not they can pursue the termination option or whether they should continue negotiations with FDOT. This culminated in a meeting in October, on October 19, 2018, the CEOs for Granite, Lane, and Skanska SE were all present. And it was during that meeting that the party, the three parties agreed, we're not going to pursue the termination option at this time. Let's try and negotiate a settlement with FDOT. That is the point at which your colleague says, as I understand it, that Lane should have exercised its equitable rights. It certainly had the option to run to court to seek a junctus remedy. It could have filed suit and gotten some equitable remedy, I suppose dissolved in partnership for one thing. You know, I guess Lane had whatever options were available to him under dispute resolution provisions. They could have sought an injunction. They could have gone to court. My concern, and the question is obvious, that you don't get an equitable remedy when you sit by and watch the problem occur. That's exactly right. So that goes back to the beginning. I'm not arguing your case, but what I'm saying is they start off, they admit there is a potential problem between S.E. and I.D. from start. Correct. They went in with their eyes wide open. They understood. They go in with their eyes wide open, so the potential becomes reality. So the question is, in terms of equitable remedies, what does the Chancellor say? It's just, what I'm saying is it sort of, let me draw an analogy. The defendant defrauds, the defendant fraudulently induces the plaintiff into entering to a contract with fraudulent misrepresentation. And the plaintiff discovers that. What remedies does the plaintiff have at that point in time? To seek injunctive or leave? It could rescind the agreement, which is an equitable remedy, or stand on the contract and sue for damages. And they stood on the contract. They stood on the contract, so the equitable remedies went out the window. Yes, I would agree. And it's also important to understand. The problem is you have to reconstruct what would have happened but for the breach. That's all speculation. I'm speaking for myself. Correct. And what happened from that October 2018 meeting going forward is they put the termination option on the side. They pursued negotiations with FDOT, with Don Fusco, the CEO of Skanska SC in the lead in those negotiations. And Mr. Alger, the CEO of Lane Construction testified at trial that he trusted Mr. Fusco to lead the negotiations. He testified that Mr. Fusco was a stand-up guy. The internal communications during the end of 2018 and into 2019 at Lane said, we're going to put the termination option in our back pocket for now. Let's see if the FDOT negotiations are successful. In August of 2019, Mr. Fusco reached a deal on behalf of SGL or SA22, which put $125 million in the joint venture, reduced liquidated damages from $175,000 a day to about $5,000 a day, reserved the right for their cumulative impact claim. And Mr. Alger, on behalf of Lane Construction, in a text to Mr. Fusco that's in evidence, said that works. We have a handshake deal on the agreement with FDOT. And this is a year after they started complaining about potential conflict issues. They reached the handshake deal. A week later, at the direction of WeBuild, they were negged. And it was at that point that Lane Construction said, we now demand termination. And it's at that point where, granted, agreeing with Skanska that SA22 was in the best interest of the partnership, voted in favor of the SA22 deal. And the court, in looking at that factual pattern, said Skanska SE did nothing wrong. Any potential conflict was tenuous at best, and they acted in the best interest of the joint venture. And to follow the path that Lane is suggesting would have been ruinous for all involved. The evidence that Lane put on at trial had everything to do with Skanska SE acting on the conflict of interest. They're raising this new issue for the first time on appeal, that there is, that the conflict of interest or the application of 620-8404-2B is strict liability. They didn't argue that in their complaint. They don't allege anything about strict liability in their complaint. They don't say anything about strict liability in their pretrial brief. They did not argue that issue at trial. If you go back and look at their post-trial brief, in their conclusions of law, you won't see anything about the standard that counsel is now talking about, this, in effect, strict liability standard. The first time we're seeing it is on appeal. He references a motion for summary judgment that they filed. I would ask the court to look at the court's order on the motion for summary judgment, pages 12 and 13, where he says that the issue he was looking at on the motion for summary judgment was Lane's breach of fiduciary duty claim based on Skanska's refusal to pursue the termination option, to act on the conflict. That was the position they took below, and now they're taking an entirely different and new position on appeal, a position that is soundly rejected by the district court, in his opinion. Thank you. Okay. Very well. Thank you so much. Mr. Henner, are you going to talk to us about breach of contract? May it please the court, I'm Joe Henner, I represent Granite Construction Company. Granite Construction Company received summary judgment on three different counts, breach of contract, indemnification, breach of guarantee, and the joint venture agreement has all kinds of different indemnification provisions, including the working capital one, which is the only thing that they've talked about on appeal. So, under SEPUPO, I believe that the indemnity and the breach and guarantee are sufficient because there was one award for one amount of damages for all three breaches, and so we believe they haven't raised anything about the indemnification. And so, as a matter of, y'all don't even need to reach the issue. Granite's indemnification claims against Lane and WeBuild exist independently of its breach of contract. Lane agreed in writing, in a brief, that Article 3.2 is not tied to working capital calls. It's just about how much money you paid, and it provides a separate avenue for a party to recover if it contributes more than its proportionate share for any reason. That's what the JVA says. The 11th Circuit has ruled in SEPUPO that if you don't challenge all the grounds for an award, you can't win. They have not brought up anything about the guarantee or the indemnity in the briefs. I don't know if this is the right way to look at it, but I mean, the district court said that all these claims kind of rise and fall together, and they're all about the same thing. I mean, aren't they challenging, at the base of it, they're challenging the district court's analysis that there were no disputed facts? Well, the disputed facts on the breach of contract is irrelevant because of Article 3.2. Article 3.2 specifically says that each party has to pay its proportionate share of losses arising from the project. If a party pays more than its proportionate share for any reason, the other party shall indemnify, hold harmless, and shall reimburse such party. The working capital call, the judge said that Skanska substantially complied with the working capital call. For granted, it doesn't really matter. We believe, as a matter of law, based on this JVA, it's undisputed. We paid more, they paid less. The JVA is very clear that I'm entitled to be paid back my proportionate share. But subject, right, to some willful misconduct excepted. Which there is absolutely no allegation against granted in that regard. We're a 30% owner. We paid more, they paid less. They've got to pay us the $30,450,000 plus pre-judgment interest to get back to square. Right? Because the JVA is so clear, the proportionate shares, proportionate shares, everything is based on proportionate shares. The guarantee is an independent right, again, against we build if we pay more than our proportionate share. So you're saying these are arguments, just to be clear, I think I understand you. You're making arguments that are specific to granted, that don't necessarily go to this concept. That's correct. Do you want to address the issues that are sort of the more meta issues about the summary revenue? Yeah, I mean, I feel like at some point, someone needs, and you guys can split your time how you want to, but someone needs to address what I'll call sort of like the core breach of contract genuine issue. The only issue they raised is about the working capital and the unanimity. So their position is- Validity of the call. Validity of the call. So regardless that we're losing $20 million a month, they don't have to pay if they don't sign a piece of paper. That's their position. And I guess, I mean, yeah, so is there a genuine issue of material fact with respect to that? No, not at all, Your Honor. It's Lane's person who came up with how much money was going to be needed. Judge, you asked about why they didn't sue. They got the SA-22 money. We used that money until the beginning of 21. We ran out of money. My point is that they basically slept on their rights if they had an equitable remedy. That's right. But the reality, Your Honor, is they ran out of money. There is an analogy to the fraudulent inducement contract. Once you understand the breach, if you got an equitable remedy, you better exercise it right there. That's right. That's right. Or you're stuck with damages. In this situation, what happened was we got SA-22. That allowed us to run the job until the beginning of 21. Lane's person came up with how much money we were going to need each month and how we were going to do that each month. Everybody agreed to that. And then Mr. Cellini, who bought WeBuild, said specifically, you are not permitted to make any more capital calls, nothing to do with working capital. He just said you can't make any more capital calls, and so go sue them. Three days before it was due, they sued us, or sued Lane. We had to come in to say, hey, you owe us $30 million. So that's what we did, and the judge ruled on that. I think from the breach of contract, it's valid. There's no dispute we paid more and they paid less. I guess, as to the validity of the call, tell me why there's no genuine issue of material fact when Penalver says, look, I've been crowing about formality for a long time, written this for a long time. He says, yeah, I did say this thing about it being okay. That was really just about amount, not as to form. And of course, you disagree with all of that, but why are those not factual issues? Because the money was due. They said it was due. The capital call says you have to agree that the money is due and the timing it was due. Lane put that together. We don't believe there was any dispute. They said it looks good, okay. The first time we heard they weren't going to pay was when they got the direction from Mr. Cellini that we're not allowed to pay anymore. They're not allowed to put anything in, no matter what. Then they filed a lawsuit to stop paying, and indeed, they didn't pay. So isn't the right, I mean, it seems like one way to look at this from your perspective is that when they decided they weren't going to pay no matter what, they breached the contract, that they anticipatorily said, look, you can unilaterally call, you can unanimously call. Jesus Christ could call. We don't care. We're not paying, right? And so that's a breach of the contract. That's a matter of law. That's it, right? And that's what Judge Dalton found. The rest of the stuff they're talking about is really dicta, in his opinion, in my opinion. And the final argument for the first time- And there's no, I mean, just to be clear, I mean, there's no factual dispute that that's what happened, that they said- Absolutely. You're just not going to participate anymore. We're not getting any more money. And they never did. And then the prejudgment interest, they brought it up for the first time, exclusive remedy. Obviously, this court in Venn has held that the Argonaut case controls and interest is a pecuniary element of damages, and you're entitled to it from the time of the breach. So as a matter of law, we believe that should also be affirmed. Thank you all. Okay. Very well. Mr. Frederick, you've got three minutes. I'm sure you'll get more time, but could you address this? I will say the dispute of fact on the breach of contract, I mean, it seems like what the district court was saying here is just, look, once you've said you're not going to pay any more money, no matter what, well, then the formalities of this, none of this matters because you've breached your duty. Yeah. And now I do want to clear that up. There is a disputed issue of fact because the Lane representative said it wouldn't orally approve calls. So the testimony about it being okay was an oral statement. Lane had said, we want to stick to the formalities, the capital request form was a written form requiring signature. And so there is a disputed issue of fact about whether this was an unequivocal withdrawal from all capital calls. And Judge Brasher, let me point out to you the addendum to our reply brief where we noted that what Skanska was attempting to do was to kick Lane out of the joint venture while the appeal was pending and after Lane had made a $10 million capital call. So it would be an erroneous statement about what the undisputed facts are in light of Lane's conduct while this appeal was pending. So you're saying that Lane was willing to make additional capital calls? If they were properly offered and documented. And the problem with the documentation... Where would I go to look to find record evidence that Lane was just saying, look, the problem isn't that we're not going to put any more money in, the problem is that you didn't cross the D and not the I. We cited some of this evidence in our opening brief at pages 18 and 19 and in our reply brief at page 25. I'd be happy to submit an additional letter that would go through the JA references. I don't have them in my notes here. But I would just say that on the breach of contract claim, the dispute fundamentally is... Oh, actually, my colleague has referenced JA 752 and JA 749. So I think that there's clearly disputed issues of fact about the nature of the repudiation, whether it is more limited or whether it is an unequivocal title. And the district court erred in saying there was no disputed issue of fact about that. And that had very large implications because the question of whether or not these capital calls were properly rendered had to do with whether Skanska was managing this project correctly by giving full disclosure about the nature of the documentation about these capital calls and the like. I do want to go... And you were right, Judge Brasher, that this goes to all of the remedies for contract. If there was no breach of the contract, the other aspects don't come into play. Judge Newsome, in answer to your question about the best interest, he doesn't defend best interest based on the plain language of the statute. And the statute, I want to point out, we have not talked about this in that provision. It says that if there is an adverse interest, the conflicted partner shall not participate in a, quote, conducting partnership business. So it's not just external transactions, but it is conducting the business of the partnership. Yeah, but so how is there an adverse, I guess, given corporate formality, where is the adverse interest? I guess that's what's confusing to me. I mean, your suggestion is they need a firewall or something like that, but they've already got separate corporations. But Your Honor, the testimony was that Mr. Kennedy was supervising both entities and he insinuated himself into the aspect in order to protect Skanska ID at the crucial point in time when they were trying to put pressure on I-4MP because that was the only funding mechanism with whom they had privity of contract. I mean, I don't know. I've looked at the district court's fact findings. It seems like there might have been some evidence of that, but it seems like the district court said that's not what happened, and especially based on Fusco's testimony, just said that's not what happened. Fusco decided this himself and that was what happened. But you have to look at that in terms of what the failure to apply the statute correctly. If we were attorneys and we had a client whose interest became adverse to us, we would have a duty either to withdraw from the case or to go to the client, make full disclosure, which has never been done here, and seek to get the consent of the client to continue the representation. So in the attorney-client context, a conflict of this nature would be very clear and would be handled in a manner fundamentally different from the way that Skanska SE handled this particular conflict. So just to be clear, I mean, are you saying that whenever, and this I think goes to something Judge Joflat asked, are you saying that when this arrangement was created, where you have a subsidiary, a parent, and another subsidiary as the concessionaire, there's an inherent conflict? No. What I'm saying is there's a potential conflict. There's a potential conflict. There's a potential conflict. If they ignore all corporate formality and start doing things wrong, right? No, if they ignore the contract, which calls for a behavior by the managing partner under the statute, so that if the potential conflict arises to the statutory language of, quote, adverse interests, then there needs to be a change in the partner's conduct. It just seems like you're assuming, you're not getting, what made Skanska SE have an adverse interest? It could not threaten to do anything vis-a-vis this project that would harm Skanska ID's interest in the concessionaire. But didn't the district court say that's not true? Didn't the district court say that they absolutely could and they made this determination without regard? District court misunderstood respectfully because it was looking at this through the wrong lens. If you look at it from a conflict in an attorney perspective, I'm going to continue representing this client because I think that's in the best interest of the client, even though I have a conflict. You're assuming the conflict. I guess that's my, if you're an attorney and there's an unrelated attorney, right? I mean, I guess that's my point. If they're separate corporate structures, where does the conflict arise? I get your point. If there's a conflict, I'm just trying to figure out, if it's not the specific involvement of the parent saying I want you to do this because it helps your sister corporation, if they observe corporate formality, where is the conflict? They testified that they were not following the corporate form in the sense that Skanska AG viewed this as one transaction. That was undisputed testimony. One Skanska was the policy. So if Skanska SE loses money, but that benefits Skanska ID, we're all okay with that. And we know that because there has not been a disclosure of the relationships between Skanska ID and SE that have harmed Lane's interests in this transaction. And so there is a contrivance for the claim of the breach of contract, but more fundamentally, Judge Brasher, there is clear adversity under the statute where the losses as they have mounted on the construction side are being absorbed by the minority interests and the majority interest on the concessionaire side is making the money. So it's just math. You can lose money if you're on one side, but if you're going to make money on the other side for Skanska, it's all rolling up to AB. I get that, but that's not something, I mean, I guess that's a conflict that's inherent to the transaction the way it's true. No, it's... If every profit for SE means a loss for the concessionaire and vice versa, then it's inherently conflicted. No. Let me explain that. In most public-private partnerships, if the construction part is on time, on budget, or fairly close, everybody wins. The conflict arises, though, only when the construction side is so badly managed as this one was that it incurs losses that are uniquely sustained only by members of the partnership who cannot recoup their losses on the concession side. That happens in rare circumstances. It certainly happened here to an enormous degree, and that's where the fundamental problem is. And so we're asking you to apply the statute as it has written, and we're asking you to understand that when Lane is talking about the contract and making an unequivocal repudiation, it's not what it's saying is we're conditioning our giving the capital calls on the basis of additional information following the written forms, et cetera. And the district court blew right past all of that to find that Lane had breached the contract through their representations. It's never going to pay again. And we know that that's not true because in December of 2024, when this appeal was in this court, Lane paid money and Skanska nonetheless wrote a letter saying, we don't care about your appellate bond. We're kicking you out of the partnership. Now, Judge, you want to talk about equity, you have to understand that these measures are important for understanding the equity of this particular relationship. And there is no argument here that Lane waited too long to assert its breached fiduciary duty claim, which a lot of your questions were going to, shouldn't it have acted faster? They've never argued that there was a breach of statute of limitations or anything of that nature. And so for these reasons, the case should be reversed on the fiduciary duty claim and the case remanded for further proceedings. Okay. Very well. Thank you. Thank you all. Cases submitted will be in recess until 9 o'clock tomorrow morning. All rise.